NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5386-13T3

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

AMIE MARROCCELLI a/k/a
ANNIE M. MARROCCELLI,

       Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

January 30, 2017

APPELLATE DIVISION

Telephonically Argued January 11, 2017 —
Decided January 30, 2017

Before Judges Sabatino, Nugent and Haas.

On appeal from Superior Court of New Jersey,
Law Division, Somerset County, Indictment
No. 11-06-0380.

Stephen W. Kirsch, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender,
attorney; Mr. Kirsch, of counsel and on the
brief).

Merrill M. Mezzacappa, Assistant Prosecutor,
argued the cause for respondent (Michael H.
Robertson, Somerset County Prosecutor,
attorney; James L. McConnell, Assistant
Prosecutor, of counsel and on the brief).

    The opinion of the court was delivered by

HAAS, J.A.D.

On June 16, 2011, a Somerset County grand jury returned an indictment charging defendant Amie Marroccelli with one count of second-degree vehicular homicide, N.J.S.A. 2C:11-5(b)(1).[1] Prior to trial, the State made a number of pretrial applications, including a motion to preclude defendant from introducing evidence that it was her habit to never drive in the left lane of a three-lane highway or to exceed the speed limit. On July 3, 2013, the trial judge granted the State's motion and excluded this evidence.

In March 2014, the matter proceeded to trial before a jury. During the trial, the trial judge granted the State's motion to preclude defendant from introducing a note in evidence that she alleged her husband had written in which he stated that he was driving the car at the time of the accident that caused the victim's death.

At the conclusion of the trial, the jury found defendant guilty of second-degree vehicular homicide. The trial judge denied defendant's motion for a new trial. On May 23, 2014, the judge sentenced defendant to seven years in prison, subject to an 85% period of parole ineligibility pursuant to the No Early

---

[1] At the time of her arrest, the police cited defendant for driving while intoxicated ("DWI"), N.J.S.A. 39:4-50, and making an unsafe lane change, N.J.S.A. 39:4-88(b).

Release Act, N.J.S.A. 2C:43-7.2, and three years of parole supervision upon her release.[2] This appeal followed.[3]

On appeal, defendant raises the following contentions:

POINT I

WHEN DEFENDANT PROFFERED A HANDWRITTEN CONFESSION NOTE FROM HER HUSBAND, WHICH CLAIMED THAT HE, NOT SHE, WAS THE DRIVER OF THE CAR ON THE NIGHT IN QUESTION, THE JUDGE IMPROPERLY EXCLUDED THAT NOTE FROM EVIDENCE.

POINT II

THE JUDGE IMPROPERLY EXCLUDED EVIDENCE THAT DEFENDANT PROFFERED OF HER DRIVING HABITS ON THE ERRONEOUS THEORY THAT, WHILE IT WAS COMPETENT EVIDENCE OF HABIT, IT WAS INADMISSIBLE BECAUSE DEFENDANT WAS DENYING BEING THE DRIVER OF THE CAR ON THE NIGHT IN QUESTION.

POINT III

IN BOTH CROSS-EXAMINATION OF THE DEFENDANT AND IN HER SUMMATION, THE ASSISTANT PROSECUTOR IMPROPERLY USED EVIDENCE OF SPECIFIC INSTANCES OF CONDUCT TO PROVE A CHARACTER TRAIT OF THE DEFENDANT, IN DIRECT VIOLATION OF N.J.R.E. 608(a) AND 405(a). (NOT RAISED BELOW).

---

[2] At sentencing, the judge also found defendant guilty of both motor vehicle violations and imposed appropriate fines and penalties.

[3] In September 2014, the trial court granted defendant's application for bail pending appeal and she was released from prison after serving approximately 100 days of her sentence.

POINT IV

> EVEN IF ANY ONE OF THE COMPLAINED-OF ERRORS
> WOULD BE INSUFFICIENT TO WARRANT REVERSAL,
> THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO
> DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL.

After reviewing the record in light of the contentions advanced on appeal, we reverse and remand for further proceedings.

I.

The primary issue at trial was whether defendant was driving her car on I-78 in Somerset County on the night it struck a vehicle driven by the victim. The State presented the following proofs during the trial.

On October 10, 2010, defendant and her husband, Jason Bradbury, were in a white BMW registered to defendant. The couple were returning home after attending the wedding of defendant's employer's child. At approximately 8:00 p.m., the only witness to the incident ("the witness") was driving a truck in the center lane of the three-lane highway. The victim's car was also in the center lane, about six car lengths ahead of the witness. Although it was dark, the weather was clear, visibility was good, and traffic was moderately heavy.

The witness testified that a "white vehicle" driving in the left lane passed the witness's car and came alongside the victim's car. That vehicle was later identified as defendant's

A-5386-13T3

BMW. After about two seconds, the BMW suddenly swerved into the center lane, and the passenger side of the BMW struck the driver's side of the victim's car, forcing both vehicles off the road. The witness stated that the BMW did not use a turn signal when it changed lanes and was travelling approximately seventy-five to eighty miles per hour when it passed him.

The witness did not stay at the scene, but contacted the police three days later and gave a sworn statement concerning his observations. At trial, the witness testified that he did not see whether a man or woman was driving the BMW. However, he admitted that he referred to the BMW's driver as "that guy" a number of times in his statement to the police. He also told the police that the accident was "bizarre," as if "something" happened to cause the BMW to suddenly change lanes, "like a child jerking the steering wheel, or . . . somebody dropped a cigarette in their lap."

The victim's car crashed in a "clump of trees" just before an entrance ramp. The BMW came to a rest down a hill in a "wooded marshy-type area" on the other side of the entrance ramp.

At approximately 8:06 p.m., Trooper John Mucksavage arrived at the accident scene. The trooper found that the victim was unconscious and called for an ambulance, which arrived at about

8:14 p.m.  Shortly thereafter, a helicopter was summoned to airlift the victim to a hospital.  The parties stipulated that the victim died the next day of a brain hemorrhage caused by a blunt-impact injury.

About ten minutes after arriving at the scene, Trooper Mucksavage noticed defendant and Bradbury standing together on the side of the road.  Because he was assisting the victim, the trooper did not talk to the couple for another ten minutes.

At that point, defendant told the trooper that she had been driving the BMW in the right lane of I-78 at the time of the crash.  According to defendant, Bradbury was sleeping in the passenger seat.  Defendant told the trooper that she thought she saw a deer that "looked like a dog" in the road ahead of her and swerved to the right to avoid it and ended up down the hill in a ditch.  Defendant stated she did not remember seeing the victim's car or hitting it.

Trooper Mucksavage examined both vehicles and concluded that the damage to the passenger side of the BMW matched the damage to the driver's side of the victim's car.  Therefore, the trooper was skeptical of defendant's account of the accident.  However, defendant continued to insist she was driving in the right lane at the time of the accident and did not remember striking the victim's car.

6

During his conversation with defendant, Trooper Mucksavage observed that defendant smelled of alcohol, her eyelids were droopy, and she had bloodshot eyes. The trooper also testified that defendant's mood changed from sad to happy and from calm to excited during the time he spent with her. Defendant told the trooper that she had been at a wedding reception and drank "a glass of wine and half of an apple martini." The trooper also testified that Bradbury was "obviously intoxicated," "disheveled," had "trouble standing at times," and smelled of alcohol.

Defendant was barefoot when Trooper Mucksavage spoke to her. Defendant told the trooper that she never wore heels when driving and had changed to flip-flops. However, she stated she lost the flip-flops while walking in the marshy area at the crash site. The trooper testified that a pair of high heels were found on the passenger side floor of the BMW. Defendant told the trooper that the driver's side door would not open after the accident and she had to exit the BMW through the passenger door.

Around 10:00 p.m., the trooper administered field sobriety tests to defendant and she failed them. The trooper then arrested defendant and took her to a hospital for a blood test. Defendant's blood alcohol content ("BAC") was measured at .087%,

which was over the legal limit. At trial, a State expert used extrapolation analysis and estimated that defendant's BAC at the time of the crash was 0.14%.

The State's accident-reconstruction expert opined that the BMW moved from the left lane into the center lane, and struck the victim's car, causing both vehicles to go "off the roadway to the right and then down the grass embankment" after which the victim's car hit a cluster of trees. Most of the damage to the victim's car was caused by it striking the trees, rather than from the BMW striking it. The expert also found a pair of women's high-heeled shoes on the passenger side floor of the BMW. The expert determined that the driver's side seat of the BMW was pushed forward toward the steering wheel so far that, at 6'1" tall — about the same height as Bradbury — the expert could not get into the seat.

The State presented three other witnesses -- defendant's employer, an insurance adjuster, and defendant's doctor -- who stated that defendant told them she was driving at the time of the accident and crashed when she swerved to avoid a deer. The State also introduced a note defendant wrote to the victim's mother after a court appearance. In the note, defendant thanked the mother for giving her a "kind gaze" in court, and told her

that "the depth of [defendant's] guilt was immeasurable" because defendant "saw a deer" and "jolted the wheel."

After the State rested, defendant took the stand and told the jury that all of her statements about driving the car were part of a plan she and Bradbury concocted to falsely place the blame on her for the accident.[4]

Defendant explained that she met Bradbury in September 2009, and that they were engaged in April 2010 and married two months before the October 2010 car accident. This was defendant's first marriage, at age thirty-seven. Bradbury had custody of a child from a prior marriage.

Defendant stated that Bradbury drove the BMW to the wedding on the night of the accident. At the wedding reception, defendant stated she had a glass of wine and half an apple martini. The couple left the reception at around 7:00 p.m. Defendant testified that Bradbury was again driving the car. On the way home, Bradbury stopped the car and, at his behest, the couple had sex in the car for fifteen minutes before resuming the drive home, again with Bradbury driving.

_____

[4] The trial judge conducted a pretrial conference immediately prior to jury selection. During that conference, Bradbury testified that he would invoke his Fifth Amendment right against self-incrimination if he were called by the State to testify at trial. After hearing this testimony, the judge rejected the State's challenge to the validity of Bradbury's invocation of the privilege.

Defendant stated that she was in the passenger seat, staring straight ahead, when she saw "something come in front of the car." Defendant let out a gasp and threw out her hands, thinking it was a dog. Later, defendant stated that Bradbury told her that she also grabbed him. Defendant said that the next thing she knew, the car had gone off the road, and ended up in an area full of "deep mud," bushes and trees.

Immediately after the BMW came to a rest, defendant testified that Bradbury became aggressive and yelled at her that it was her fault that the car left the road. Bradbury told defendant that he already had one DWI conviction and could not risk getting a second because he might lose custody of his child to his ex-wife. Therefore, Bradbury began pressuring defendant to claim that she was driving at the time of the accident. Believing she was not over the legal limit, and feeling responsible for the accident because Bradbury claimed she grabbed him, defendant agreed with Bradbury's plan. At that time, defendant stated that neither she nor Bradbury knew that the BMW had struck another car or that anyone had been injured.

Defendant testified that after Bradbury called 911, she and Bradbury switched positions in the car. Before moving to the driver's seat, defendant took off her high-heel shoes to avoid injuring Bradbury as she climbed over him. Defendant stated

that when she was in the driver's seat, she adjusted the seat forward, and moved the mirrors to make it look like she had been driving. Because she never drove a car while wearing heels, defendant next asked Bradbury to get her flip-flops out of the trunk and to put her heels there. Although Bradbury got the flip-flops, he neglected to put the heels in the trunk. As soon as defendant climbed out of the passenger side door, she lost the flip-flops in the mud.

When Trooper Mucksavage arrived at the scene, defendant did most of the talking and consistently told him that she had been driving. When the trooper asked what lane defendant was in when she left the road, defendant replied that she was in the right lane because "[t]hat's where I drive" and this was "an automatic response." At that time, defendant stated she was still not aware that another car had been involved in the accident or that the victim's car had been struck on its driver's side.

According to defendant, at the hospital, and in her later conversations with her doctor, the insurance adjuster, her employer, and her parents, she continued to stick to the false story she and Bradbury created about the accident. However, defendant testified that after learning in March 2011 that she was going to be charged for causing the victim's death, she confronted Bradbury and told him that he needed "to tell the

11

truth." Bradbury refused and continued to insist that the accident was defendant's fault and that he was afraid he would lose custody of his child if he came forward. Defendant stated that the couple's relationship deteriorated and they later separated.

Thereafter, defendant told her family and friends that she was not driving at the time of the accident. At trial, defendant's father and two of defendant's friends testified that defendant had the habit of never driving when she had consumed alcohol, and that her character was one of cautiousness and non-recklessness.

## II.

In Point I of her brief, defendant argues that the trial judge mistakenly exercised his discretion by barring her from introducing a handwritten note in which Bradbury confessed to driving the car. Prior to granting the State's motion to exclude the note, the judge conducted a Rule 104 hearing from which we derive the following facts.

Defendant stated that on March 29, 2011, she received a telephone call informing her she was going to be charged and that she needed to turn herself in. She did so the next day. At that point, defendant told Bradbury, "[w]e need to tell the

truth." Defendant asked Bradbury to "come forward," but he refused.

In the days that followed, the couple continued to argue and, according to defendant, things came to a head during the early morning hours of April 5, 2011. Defendant described the argument as follows:

> I said he needs to come in with me. We need to tell the truth. Even if he believes that I was the cause, that's okay. Just say I was the cause, but you have to tell the truth that you're the driver.
>
> He won't do it. He said he won't lose his [child]. He can't do that for me, but he'll write me a letter just to prove to me that, to calm me down basically. He wanted to give me something to calm me down.

Defendant testified that she watched as Bradbury wrote out a note by hand and signed it in her presence. The note stated:

> To Whom it May Concern;
>
> I, Jason Bradbury, was driving the car at the time of the accident on 10-10-10. [Defendant] was not driving.
>
> Jason Bradbury
>
> 2:32 AM      4-5-11

Defendant stated that she told Bradbury that the note "wasn't good enough" because he needed to come forward and personally tell the truth to the authorities.

Defendant then went to the upstairs bedroom and locked the door. The next morning, defendant woke up and found that Bradbury had taped the note to the bedroom door. The note she presented at the Rule 104 hearing still had tape on it.

Defendant testified that she did not consider giving Bradbury's note to the authorities because she "didn't think [the note] was good enough" in light of the fact that Bradbury was still refusing to personally go to the police or the prosecutor. Defendant stated that she held onto the note for "a long time." In July 2012, defendant told her attorney that she had the note and the attorney advised the prosecutor. Thus, the State had a copy of the note approximately eighteen months prior to the trial. Defendant stated that after meeting with her attorney, she put the original note in an envelope and gave it to a friend to hold for her.

In a brief oral decision following the Rule 104 hearing, the trial judge found that the note, if authentic, was a statement that subjected Bradbury to criminal liability and, therefore, fell under the hearsay exception for statements against interest set forth in N.J.R.E. 803(c)(25). However, the judge stated that defendant was the only witness at the Rule 104 hearing concerning the authenticity of the note and, therefore, he did "not have the benefit of handwriting analysis, known

14                                                          A-5386-13T3

exemplars of handwriting, signatures of . . . Bradbury from known reliable sources, or any other means or method by which to support the assertion that the note is authentic[] and, therefore, trustworthy."

The judge also found that defendant never gave the note to the police or the prosecutor's office "because it wasn't good enough." The judge further observed that the note

> was, under any application of law or logic, better than the circumstance in which she found herself charged with a second[-]degree crime, and it is, and to say that it was not produced for who knows how many months after April [2011 until July 2012] . . . to say that it wasn't produced, it wasn't made known in an effort at least to begin the exculpation process is a statement which is simply not worthy of belief.

In denying defendant's subsequent motion for a new trial on the ground that the note had incorrectly been excluded from evidence, the trial judge reiterated that while the note was "clearly exculpatory [of defendant] and clearly exposes Jason Bradbury to penal consequence, that does not obviate the necessity for the court to find that the statement is sufficiently authenticated so as to be reliable as being the product of [Bradbury's] hand." Once again, the judge observed that defendant did not present any handwriting experts to support her claim that Bradbury wrote the note. He also found that based on defendant's prior statements to the police and

others that she was the driver, he did not believe defendant's claim that Bradbury wrote the note. Therefore, the judge denied defendant's motion for a new trial.

On appeal, defendant contends that although the trial judge correctly found that the note subjected Bradbury to criminal liability and therefore fell under the hearsay exception set forth in N.J.R.E. 803(c)(25), he incorrectly ruled that defendant did not properly authenticate the note. Defendant argues that because she observed Bradbury as he wrote the note and was also familiar with his handwriting, this was sufficient to establish a prima facie showing of the note's authenticity. Thus, defendant asserts that the note should have been submitted to the jury for a closer examination and an ultimate determination of its authenticity. By excluding the note from evidence, defendant contends that the judge "usurped the credibility-determination role of the jury." We agree with defendant's contentions.

Established precedents guide our task on appeal. We review a trial court's evidentiary rulings for abuse of discretion. State v. Nantambu, 221 N.J. 390, 402 (2015). Consequently, these rulings will not be overturned unless a manifest injustice has occurred. State v. J.D., 211 N.J. 344, 354 (2012). However, "[t]o the extent [a] defendant's argument . . . raises

a question of law, . . . our review is de novo and plenary." Ibid.

We begin by stating our agreement with the trial judge that the information in the note "tended to subject [Bradbury] to . . . criminal liability," and was therefore admissible as a statement against interest under N.J.R.E. 803(c)(25). "The statement-against-interest exception [to the hearsay rule] is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably. Consequently, statements that so disserve the declarant are deemed inherently trustworthy and reliable." State v. Williams, 169 N.J. 349, 358-59 (2001) (quoting State v. White, 158 N.J. 230, 238 (1999)). Thus, "[t]he law of evidence recognizes that a statement in which a party confesses to having committed a crime subjects the declarant to criminal liability, and therefore constitutes a statement against interest." State v. Cope, 224 N.J. 530, 554 (2016) (quoting White, supra, 158 N.J. at 238).

The ultimate issue of criminal liability in this case hinged on whether defendant or Bradbury was driving the BMW at the time it struck the victim's car. By stating in the note that he "was driving the car at the time of the accident on" October 10, 2010 and that defendant "was not driving[,]" and

assuming the authenticity of the note, Bradbury clearly placed himself in jeopardy of a criminal charge, including vehicular homicide.[5]  Thus, Bradbury's statement in the note was not inadmissible hearsay under N.J.R.E. 803(c)(25).

Of course, a writing must be properly authenticated before it is admitted into evidence.  State v. Hannah, ___ N.J. Super. ___ (App. Div. 2016) (slip op. at 12).  However, the burden of establishing a prima facie showing of authenticity "was not designed to be onerous."  Id. at 13 (quoting State v. Hockett, 443 N.J. Super. 605, 613 (App. Div.), certif. denied, ___ N.J. ___ (2016)).  N.J.R.E. 901 states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims."  Thus, "[a]uthentication 'does not require absolute certainty or conclusive proof[.]'"  Hannah, supra, (slip op. at 12-13) (quoting State v. Tormasi, 443 N.J. Super. 145, 155 (App. Div. 2015)).  Instead, "only 'a prima facie showing of authenticity' is required."  Ibid. (quoting Tormasi, supra, 443 N.J. Super. at 155).

---

[5]  Although Bradbury's BAC was not tested, Trooper Mucksavage testified that Bradbury was "obviously intoxicated."

Here, the trial judge concluded that defendant failed to demonstrate the authenticity of the note, in part, because defendant did not produce a handwriting expert, "known exemplars of [Bradbury's] handwriting, signatures of . . . Bradbury from known reliable sources, or any other means or method by which to support the assertion that the note is authentic[] and, therefore, trustworthy." However, it is well-established that a witness who has "seen the person write, or by correspondence and other business transactions with him obtained personal knowledge of the party's handwriting," may authenticate a document written by that person. Storm v. Hansen, 41 N.J. Super. 249, 254 (App. Div. 1956) (citing Wilson v. Clear, 85 N.J.L. 474, 475-76 (Sup. Ct. 1914)).

Thus, contrary to the trial judge's finding, defendant was not required to submit corroborating evidence or a handwriting expert to support her direct testimony that she observed Bradbury write and sign the note in her presence. Defendant, who was married to Bradbury, was also familiar with his handwriting. This testimony was sufficient to satisfy defendant's burden of making a prima facie showing of authenticity under N.J.R.E. 901. Therefore, we conclude that the judge incorrectly excluded the note based upon his belief

that additional corroborating evidence was necessary to authenticate the document.

We also believe that the trial judge mistakenly barred the note from evidence based on his finding that defendant's claim that Bradbury authored it was not credible under all the circumstances of this case. The judge concluded that defendant's testimony "attributing the source of [the] note and its authorship to . . . Bradbury [was] not worthy of belief" because defendant did not immediately turn over the note to her attorney, the police, or the prosecutor's office after Bradbury allegedly wrote it. The judge also stated that defendant had an "interest in exculpating herself from the State Prison term she most certainly would expect if she was convicted." In addition, the judge found that defendant's account concerning the note was inconsistent with the State's proofs, which included defendant's prior admissions to the police, her doctor, insurance agent, employer, and parents that she was driving the BMW at the time of the crash.

However, as we have stated on a number of occasions, "'[c]ourts are inclined to assess their role in authentication as that of a screening process[,]' and 'will admit as genuine writings which have been proved prima facie genuine . . . leaving to the jury more intense review of the documents.'"

Hannah, supra, (slip op. at 13) (second alteration in original) (emphasis added) (quoting Konop v. Rosen, 425 N.J. Super. 391, 411 (App. Div. 2012)). The judge departed from this well-established rule in this case. In doing so, he made credibility determinations concerning the ultimate fact at issue in the trial, a determination that we have consistently held is within the jury's, rather than the judge's, province.

Our decision in Konop is instructive on this point. In that case, the plaintiff "suffered a perforated colon during a colonoscopy performed by" the defendant. Supra, 425 N.J. Super. at 397. In the medical malpractice case that followed, the plaintiff sought to introduce a consultation report prepared by a resident who examined the plaintiff in the emergency room. Id. at 397-98. The resident included a notation in the report stating that during the colonoscopy, the plaintiff was "moving too much" and that the defendant called for a surgical consult while "performing" the procedure. Id. at 400.

At his deposition, the resident could not recall speaking to the defendant in the emergency room, and stated that he often obtained the information for his reports from his supervisors. Id. at 399. The defendant denied making the statement. Id. at 400. The plaintiff's expert exclusively relied upon the notation in the resident's report to support his conclusion that

the defendant deviated from accepted medical standards in her treatment of the plaintiff. Id. at 397.

The trial judge granted the defendant's motion to exclude the notation from the consultation report because the plaintiff did not conclusively establish to the judge's satisfaction that the defendant made the statement. Id. at 401. Therefore, the plaintiff's expert's opinion no longer had any support in the record and the judge granted the defendant's motion for summary judgment. Ibid.

On appeal, we found that the question of whether the defendant made the statement contained in the report was a factual question for the jury, rather than the trial judge. Id. at 421-22.[6] In his comprehensive decision, our colleague Judge Carmen Messano conducted a thorough review of the case law from which he distilled specific procedures that a trial court should follow in determining whether a disputed statement in a document should be submitted to the jury for its review or excluded based upon the judge's personal determination of its trustworthiness.

In Konop, Judge Messano concluded that where there is a "condition precedent to admissibility," such as the authenticity of a document, "the judicial function is limited. The judge

---

[6] We determined that if the jury found that the defendant made the statement, it would be admissible as a statement of a party-opponent under N.J.R.E. 803(b)(1). Id. at 407.

does not determine whether the proponent has incontrovertibly proven the 'condition.' The exercise of judicial discretion requires only a determination that there exists sufficient evidence for the jury to decide the condition in favor of the proponent of the evidence." Id. at 413. Although the authenticity of the consultation report was not at issue in Konop, the single issue in dispute was similar to that involved in the present case. In Konop, the sole question was whether the defendant made the statement that was included in the report. Id. at 409. Here, the ultimate issue in dispute was whether Bradbury wrote the note admitting he was driving at the time of the accident.

Judge Messano concluded that "when the 'condition' for admissibility is purely a factual determination as to whether the hearsay statement was made . . . , the issue should be submitted to the jury to determine whether the condition was fulfilled." Id. at 420. Adherence to this rule is especially important "when the disputed fact 'is so closely tied to an ultimate issue in the case.'" Ibid. (quoting Forbis v. McGinty, 292 F. Supp. 2d 160, 162 n.2 (D.Me. 2003)). The judge further stated that

> in deciding whether to submit the issue to
> the jury, the exercise of judicial
> discretion under N.J.R.E. 104(a) is limited
> to whether the proponent adduced sufficient

23                                                        A-5386-13T3

> evidence, direct and circumstantial, to permit a reasonable jury to conclude by a preponderance of the evidence that the fact was proven. If so, the evidence should be admitted, and the jury should be instructed that it only may consider the evidence if it concludes the contested fact is true.
>
> [Ibid.]

Although Konop was a civil case, Judge Messano noted that

> this standard was particularly appropriate in a criminal case because "to deny the jury the possibility of making a particular fact-finding simply because the court would determine the fact otherwise might in criminal cases deprive a defendant of his Sixth Amendment right to have his case tried to a jury."
>
> [Id. at 417 (quoting United States. v. Barletta, 652 F.2d 218, 219 (1st Cir. 1981)).]

Accordingly, we have subsequently applied the Konop rule in criminal cases involving the authentication of documents and other tangible evidence.

For example, in Hockett, a trial judge excluded several photographs from evidence because he did not believe that the authenticating witness was credible. Supra, 443 N.J. Super. at 613. We reversed and remanded for a new trial. Id. at 609. Citing Konop, we held that

> even if there was some legitimate reason for questioning the witness's veracity about what the photographs depicted, the better course was for the judge, in his gatekeeping role, to acknowledge the photographs

> appeared to be what they purported to be and leave for the factfinder a "more intense review" of the photographs and the credibility of the authenticating witness.
>
> [Id. at 614-15 (citing Konop, supra, 425 N.J. Super. at 411.]

Similarly, in Tormasi, the trial judge at a post-conviction relief hearing precluded the defendant from introducing an "affidavit" purportedly written by the defendant's father in which the father confessed to committing the murder for which the defendant was convicted. Supra, 443 N.J. Super. at 150. The judge found that the document was inadmissible because it "'was not hand-written, not signed, and there is no way of authenticating it[.]'" Ibid. However, the defendant had presented the testimony of his siblings, who both claimed that they spoke to their father about the affidavit in the past and he acknowledged writing it. Id. at 154-55.

As in the cases discussed above, we noted that the defendant had presented sufficient evidence to support a finding that the document was authentic. Id. at 155-56. Once that burden was met, we held that

> the judge was obliged to acknowledge the statement appeared to be what it purported to be and leave for the factfinder "more intense review of the document[]," . . . and a weighing of the testimony of the

> percipient witnesses.[7]  Because the judge
> did not apply this authentication method, we
> are compelled to remand.
>
> [Id. at 156 (alteration in original)
> (quoting Konop, supra, 425 N.J. Super. at
> 411).]

Under those circumstances, which involved a bench trial, we found that the judge should have admitted the document into evidence and then, in his dual role as the factfinder, considered whether the document and all other evidence warranted the relief requested by the party.  Id. at 157.

Applying these principles in this case, we conclude that defendant presented sufficient evidence, through her testimony that she saw Bradbury write the note and was familiar with his handwriting, to meet her burden of establishing a prima facie case of authenticity with regard to the note.  Therefore, the trial judge should have admitted the note into evidence and

---

[7] We acknowledge that there is a brief statement in Tormasi indicating that "a judge in his [or her] gatekeeping role . . . may to some degree, consider the credibility of the authenticating witnesses."  Id. at 156.  Although the court cited Konop, supra, 425 N.J. Super. at 411, to buttress this statement, we fail to discern support for this proposition in Judge Messano's opinion in Konop which, as discussed above, plainly held that questions of credibility are best left to the jury, particularly in criminal cases.  However, we further note that in Tormasi, the trial judge conducted a bench trial and, therefore, was required to make rulings as to both the authenticity of evidence and the credibility of the witnesses.  This, we believe, explains the Tormasi court's reference to credibility determinations quoted above.

given the jury the opportunity to subject it and defendant's testimony to "more intense review."

We reject the State's argument that the trial judge's mistake in displacing the jury's role in determining defendant's credibility was "harmless error" under the circumstances of this case. As our Supreme Court recently reiterated in State v. J.R., ___ N.J. ___ (2017),

> An error will not lead to reversal unless it is "clearly capable of producing an unjust result." R. 2:10-2. Thus, even though an alleged error was brought to the trial judge's attention, it will not be grounds for reversal if it was "harmless error." State v. Macon, 57 N.J. 325, 337-38 (1971).
>
> An evidentiary error will not be found "harmless" if there is a reasonable doubt as to whether the error contributed to the verdict. State v. McLaughlin, 205 N.J. 185, 211-12 (2011) (citing Macon, supra, 57 N.J. at 338). The prospect that the error gave rise to an unjust result "must be real [and] sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." State v. Lazo, 209 N.J. 9, 26 (2012) (second alteration in original) (quoting [State v.] R.B., . . . 183 N.J. [308,] 330 [2005]). As the Court noted in [State v.] W.B., . . . "[c]onvictions after a fair trial, based on strong evidence proving guilt beyond a reasonable doubt, should not be reversed because of a technical or evidentiary error that cannot have truly prejudiced the defendant or affected the end result." 205 N.J. [588,] 614 [(2011)].
>
> [(slip op. at 29).]

A defendant "has the right to introduce evidence that someone else committed the crime for the purpose of raising doubt about his [or her] own guilt." Cope, supra, 224 N.J. at 552 (citing State v. Koedatich (Koedatich II), 112 N.J. 225, 297, 299 (1988)). "A confession by another is of such probative importance in a criminal trial that its exclusion . . . has been held a denial of the defendant's due-process right to a fair trial." Id. at 554 (quoting State v. Jamison, 64 N.J. 363, 378 (1974)). Thus, "[a] court cannot bar the admissibility of third-party guilt evidence that 'has a tendency to endanger reasonable doubt with respect to an essential feature of the State's case.'" Id. at 552 (quoting State v. Fortin (Fortin II), 178 N.J. 540, 591 (2004)).

Here, the trial court's erroneous evidential ruling kept from the jury the only tangible, corroborative evidence defendant had concerning her claim that Bradbury was driving the car on the evening of the accident and, therefore, was responsible for causing the victim's death. The exclusion of the note clearly harmed defendant's defense because if the note were found to be authentic by the jury, it would have strongly supported defendant's testimony that she initially lied to the police and others in order to keep her husband from being arrested for another DWI.

While the State correctly points out that defendant consistently claimed she was driving the BMW prior to giving the note to her attorney and the prosecution eighteen months before the trial, the State's evidence was likewise totally dependent on whether the jury found defendant's earlier admissions to be credible. Because the note clearly went to the ultimate issue of whether defendant or Bradbury was driving the BMW, we conclude that the judge's error in excluding this evidence was "clearly capable of producing an unjust result." Ibid. Therefore, we reverse defendant's conviction and remand for further proceedings.

### III.

Although we have determined that this matter must be remanded for a new trial or other proceeding, we briefly address defendant's remaining contentions on appeal. In Point II of her brief, defendant asserts that the trial judge mistakenly exercised his discretion by preventing her from presenting evidence concerning her driving habits to support her claim that she was not driving the BMW at the time of the accident. Again, we agree.

N.J.R.E. 406(a) states: "Evidence, whether corroborated or not, of habit or routine practice is admissible to prove that on a specific occasion a person . . . acted in conformity with the

habit or routine practice." Before trial, defendant proffered three witnesses -- defendant's father and two of her friends -- to demonstrate three aspects of her driving habits: (1) that she never drives in the left lane of a three-lane highway; (2) does not drive in excess of the speed limit; and (3) never drives after drinking alcohol. The State objected and filed a pre-trial motion to bar defendant's witnesses from providing this testimony.

In granting the State's motion to preclude the admission of testimony concerning defendant's habits of never driving in the left lane of a three-lane highway or over the speed limit, the judge focused on the "acted in conformity with" language of N.J.R.E. 406(a). Because defendant now denied that she was the driver of the BMW, the judge concluded that the proffered testimony would not demonstrate that she "acted in conformity with" her driving habits on the night of the accident. In further explaining his reasoning, the judge stated:

> It seems to this [c]ourt that one cannot act in conformity with a habit if one is not engaged in the activity to which the habit applies: that is to say, that it cannot be said, at least as to [defendant's] habit of not driving in the left lane on a three-lane highway and never exceeding the speed limit, that she acted in conformity with those habits on October 10, 2010, if she wasn't engaged in the conduct to which the habits apply; that is, she was not driving the automobile.

Somewhat contradictorily, however, the judge permitted defendant to present evidence at trial concerning her habit of never driving if she has been drinking.

We are satisfied that the trial judge took too restrictive a view of N.J.R.E. 406(a) by reading it to mean that habit evidence cannot be used to "prove a negative," i.e., that defendant was not driving. The purpose of habit evidence is to show the "person's regular practice of responding to a particular kind of situation with a specific type of conduct." State v. Kately, 270 N.J. Super. 356, 362 (App. Div. 1994). In this case, defendant sought to establish her regular practice that if she is in a car that is speeding in the left lane of a three-lane highway, she is never the driver because she never drives in that lane and never exceeds the speed limit. Thus, defendant's proffer was clearly within the intendment of the rule and the judge erred by barring the jury from considering this testimony.

In Point III of her brief, defendant argues for the first time on appeal that the assistant prosecutor improperly referred to "evidence of specific instances of conduct" by defendant that were "not the subject of a conviction" to attempt "to prove a character trait of . . . defendant" in violation of N.J.R.E. 608(a) and N.J.R.E. 405(a). Specifically, the prosecutor

asserted that because defendant demonstrated that she could be "assertive" on other occasions, this disproved her contention that she meekly acceded to Bradbury's request that she take the blame for the accident. Defendant did not object when the prosecutor introduced this subject during her cross-examination of defendant and during her closing summation to the jury.

We generally "decline to consider questions or issues not properly presented to the trial court . . . unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indemn. Ins. Co., 62 N.J. 229, 234 (1973). Because we are remanding this matter, defendant will have the opportunity to raise an appropriate, timely objection should this issue arise in a new trial or other proceeding. Therefore, it is not necessary to consider defendant's argument at this time. Ibid.

Finally, in Point IV, defendant argues that if any of the trial judge's errors are insufficient by themselves to warrant a reversal, the cumulative effect of those errors casts sufficient doubt on the verdict to require reversal. As discussed above, we have determined that defendant's conviction must be reversed and the matter remanded for further proceedings, including a new trial if necessary. Therefore, defendant's contention is moot.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5386-13T3