<div style="border:1px solid black">

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

</div>

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3034-22

D.W.,[1]

    Plaintiff-Appellant,

v.

K.M.,

    Defendant-Respondent.

_____

Submitted October 8, 2024 – Decided October 16, 2024

Before Judges Firko and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-1854-19.

Wilson Elser Moskowitz Edelman & Dicker LLP, attorneys for appellant (Thomas A. Gentile, of counsel and on the briefs).

Rutgers Law Associates, attorneys for respondent (Amy L. Braunstein, of counsel; Brian P. Latimer, J.D., appearing pursuant to Rule 1:21-3(a), on the brief).

---

[1] We use initials because a domestic violence hearing is mentioned in the record and to protect the confidentiality of the parties. R. 1:38-3(d)(10).

PER CURIAM

Plaintiff D.W. appeals from an April 28, 2023 order denying her motion for a new trial on the issue of damages and post-judgment relief. The trial court found the jury's verdict was not against the weight of the evidence. We affirm.

I.

We discern the following facts from evidence adduced at the five-day jury trial and the record. Plaintiff is the mother of defendant K.M. Defendant alleges that in 2008 plaintiff created and funded the [K.] Major College Education Trust (the Trust). According to defendant, the "irrevocable" Trust was intended to pay the rest of her medical school education, housing, room and board, and transportation. Defendant attended two medical schools in the Caribbean. Plaintiff claimed that defendant was unable to find a residency position after graduating from medical school in 2015.

Plaintiff allowed defendant to live in her home in New Jersey while she was pursuing her career. Defendant testified that the Trust was her main source of income and that she received "[$]4,500 each month." Defendant used the disbursements to pay her credit card balances and Mercedes Benz lease payments. Because of defendant's bad credit, plaintiff purchased a home in

2

defendant's name to improve her credit score. Plaintiff claimed she intended to remodel the house, sell it, and keep the proceeds.

Defendant stated that she wanted to use the Trust to purchase a house. She testified that "it's outlined in [her] [T]rust that [she] can actually get a home . . . up to the value . . . $250,000. It could not exceed that amount."

In 2016, defendant returned to the United States and endeavored to obtain a mortgage to buy a home in New Jersey. Defendant explained that a loan officer expressed "$4,500 each month may not have been substantial enough." Defendant testified that she approached plaintiff to ascertain if the Trust's monthly disbursements could be increased from $4,500 to $5,500, to improve her loan application consideration. Defendant testified that plaintiff approved this increase in monthly disbursements.

After that conversation, defendant testified that plaintiff drafted and signed the 2017 addendum for the Trust to reflect the new increase. The addendum provided that the increased amount would take effect on or before "February 10, 2017, and continue through February 10, 2023, at which time the Trust shall terminate."

Defendant testified that plaintiff later "took the document to TD Bank in Marlton" to have it notarized. The Trust addendum reflects the name of the

notary and notary stamp. Defendant electronically submitted the signed and notarized 2017 addendum to the mortgagee to indicate her ability to obtain a mortgage loan. Defendant added that she received a $42,000 bank wire from the Trust for a down payment on the subject property and presented bank records to support her claim that the subject property was owned by her, not plaintiff.

On February 14, 2019, defendant testified that a domestic violence incident occurred between herself and plaintiff. Defendant testified that her relationship with plaintiff became "tense," and "then [plaintiff] started to hit [her] and kick [her] legs" and "pull all her hair clips out" until she "went to the ground." On March 5, 2019, a Family Part judge granted defendant a final restraining order (FRO) pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, against plaintiff.

Plaintiff filed two domestic violence complaints against defendant, which were both dismissed. Defendant testified that following the domestic violence incident, she did not receive any more money from the Trust. Prior to the issuance of the FRO, defendant received regular monthly disbursements of $5,500 from the Trust through January 2019.

A-3034-22

In contrast, plaintiff challenged the existence of the Trust.[2] Plaintiff contends she did not produce the 2017 addendum and did not take the document to a notary public to have it notarized. Plaintiff asserted that the whole thing was "fraud on [her], fraud on the [c]ourt." Additionally, plaintiff testified that due to defendant's bad credit score, she purchased the subject property with her own funds and put it in defendant's name to "help further her credit." In plaintiff's view, it was always the plan that she and defendant would live at the subject property for a period of time and then sell it. Following the domestic violence incident, plaintiff testified defendant stole her keys and remote to the subject property and moved into the house.

Plaintiff also claimed that defendant stole copious amounts of her personal property and was selling some of those personal items on a consignment website. Plaintiff compiled a "Stolen Items List" and claimed the value of the stolen items was in excess of $200,000. Plaintiff filed a report with the local police department claiming defendant stole personal items from her. Following a consensual search of defendant's house, the investigating officer seized designer luggage, handbags, clothing, drinkware, a sewing machine, a copier, and a

---

[2] This testimony is in stark contrast to her answer to defendant's third-party complaint, which states, "[i]t is admitted that [plaintiff] established a College Education Trust."

scanner. Ultimately, these items were returned to defendant because the court did not find probable cause they were stolen due to a lack of receipts. Defendant claimed they were gifts from plaintiff.

Plaintiff filed a complaint in the Law Division alleging promissory estoppel (count one); breach of contract (count two); anticipatory breach (count three); unjust enrichment (count four); and conversion (count five). Defendant filed an answer as a self-represented litigant. Plaintiff filed an answer as a third-party defendant to defendant's "complaint" and admitted she established a College Education Trust.

Defendant retained counsel and filed an amended answer and counterclaim alleging promissory estoppel (count one); breach of contract (count two); unlawful interference with contractual relations (count three); defamation (count four); and malicious prosecution based upon a prior criminal proceeding (count five). Defendant also filed an amended third-party complaint alleging breach of duty to administer trust (count one); breach of duty of loyalty (count two); and breach of duty to disclose (count three). Plaintiff filed an answer to the amended counterclaim essentially denying all of defendant's

6

allegations. Plaintiff also filed an answer to defendant's amended third-party complaint denying the allegations.[3]

Prior to trial, plaintiff moved in limine to exclude the Trust documents and other items from being admitted into evidence. Specifically, plaintiff challenged the authenticity of the 2017 addendum because the attached notary page states it was notarized on June 22, 2008, which was an impossibility because the notary, J.B.S., was not an authorized notary in 2008. In response, defendant's counsel claimed it was a typographical error. Additionally, plaintiff moved in limine to exclude evidencing concerning the FRO on the basis it was not relevant.

Regarding the Trust documents, the court ruled there was a genuine dispute over the authenticity of the Trust documents and that the jury should decide the issue. The court stated:

> I think that the [plaintiff] can reassert these objections if at the time of the actual testimony . . . plaintiff's position is that . . . defendant has not presented sufficient prima facie evidence in order to warrant the admission of these documents.
>
> And then the [c]ourt can make a determination at that time after hearing the testimony as to whether or not

---

[3] We refer to plaintiff and defendant in our opinion for consistency notwithstanding the varying designations of the parties in the pleadings.

. . . defendant has carried as the proponent of those documents [her] initial burden of authentication.

The court similarly concluded that defendant would be allowed to testify about the nature of the claims that led to the issuance of the FRO. Plaintiff was permitted to reassert her objection, and if overruled, the jury would make the ultimate determination as to the weight to be ascribed to the testimony or evidence.

At trial, the court admitted the Trust and 2017 addendum to the Trust into evidence over plaintiff's objection. The court explained:

> [It's] understanding of . . . [d]efendant's testimony is that she witnessed . . . [p]laintiff draft the addendum. And again, these are—this is . . . [d]efendant's testimony.
>
> [The court is not] just accepting . . . [d]efendant's testimony at face value, for purposes of this determination that she said that she witnessed [plaintiff] draft the addendum, sign it and then take it to TD Bank to be notarized. Which is a little bit admittedly peculiar, given that you would not sign something before taking it to the notary. But [the court] think[s] that that's really for the jury to assess, in terms of the weight to give that evidence if any.

The court placed restrictions on testimony regarding the FRO:

> Well, just as we're not going to attack the validity of the [FRO] that was entered in this matter, we're similarly not going to expand this to relitigate everything that

was the prior history of domestic violence in connection with the underlying [FRO].

. . .

[The court is] going to instruct the jury that there was, in fact, [an FRO] that was entered in this case, that it remains in effect to this date, and that the fact of the entry of the [FRO] may be considered, but that we're not going to delve into more of the details of the history of that beyond that.

. . .

So there can be discussion of the facts that occurred that day, but . . . like [the court] said, [it is not] necessary or appropriate for relitigation of the entire prior history of domestic violence. But they can—you can provide the facts of what occurred that gave rise to the restraining order that was entered.

Both parties testified about the incident leading to the issuance of the FRO. After redacting the FRO to exclude dismissal of plaintiff's temporary restraining order against defendant, the FRO was moved into evidence without objection.

The jury found in favor of defendant on her breach of contract of the Trust claim and awarded $264,000 in damages. The jury also found that defendant converted some of plaintiff's personal property and awarded plaintiff $2,000 in damages. The court issued a judgment in the net amount of $262,000 in favor of defendant.

9

Plaintiff filed a motion for a new trial, which was denied on substantive grounds. The court concluded that plaintiff did not carry her burden under Rule 4:49-1 because she did not "clearly and convincingly show [] that there was a miscarriage of justice under the law." The court noted there were "interpretative issues with respect to the [T]rust" and no "clear error or mistake on the part of the jury."

Regarding plaintiff's conversion of personal property claims, the court determined the questions on the verdict sheet pertaining to this claim did not contradict each other. The court stated there were a number of "potential explanations" for how the jury reached its conclusion on this issue, but there was no basis to set aside the verdict. The court similarly reasoned that with regard to the real property claims, the witnesses gave conflicting testimony, and the jury determined credibility.

Regarding the FRO, the court emphasized it barred any potential testimony seeking to undermine the validity of the FRO, but noted it was "a valid and enforceable order." Further, the court explained there were no objections raised at trial about the facts that led to the issuance of the FRO. This appeal ensued.

On appeal, plaintiff primarily argues the court committed reversible error in admitting the Trust documents and FRO into evidence. Plaintiff also contends the jury's damage award was improper, and a new trial is warranted. We disagree.

II.

"[W]e defer to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). This court reviews "the trial court's evidentiary rulings 'under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). Under that deferential standard, appellate courts "review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

We will not disturb a trial court's evidentiary ruling unless it "is 'so wide off the mark' that it constitutes 'a clear error in judgment.'" See Garcia, 245 N.J. at 430 (quoting Medina, 242 N.J. at 412). However, an evidentiary decision is reviewed de novo if the trial court applies the wrong legal standard in deciding

11

to admit or exclude the evidence.  See Hassan v. Williams, 467 N.J. Super. 190, 214 (App. Div. 2021).

A.

Plaintiff maintains the court committed reversible error by admitting the Trust and 2017 addendum into evidence because the documents "were not—and cannot possibly ever be—properly authenticated."  According to plaintiff, the Trust documents contain "facially severe deficiencies" and could not be properly authenticated under N.J.R.E. 901.  Plaintiff asserts the 2017 addendum "bears a notarization date of 2008," and manifests a lack of the indicia of reliability rendering the Trust documents "null and void."  Defendant counters that the court acted well within its discretion when it admitted the documents into evidence.

"[A] writing must be properly authenticated before it is admitted into evidence." State v. Marroccelli, 448 N.J. Super. 349, 364 (App. Div. 2017). N.J.R.E. 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims."

The burden of establishing authentication "was not designed to be onerous." State v. Hockett, 443 N.J. Super. 605, 613 (App. Div. 2016).  Thus,

A-3034-22

"[a]uthentication 'does not require absolute certainty or conclusive proof,'" but instead requires "only 'a prima facie showing of authenticity.'" State v. Hannah, 448 N.J. Super. 78, 89 (App. Div. 2016) (quoting State v. Tormasi, 443 N.J. Super. 146, 155 (App. Div. 2015)). Authenticity may be demonstrated by direct evidence, id. at 90, such as testimony from the person who authored the writing, see State v. Moore, 158 N.J. Super. 68, 83 (App. Div. 1978), or witnessed the document's execution, see Marroccelli, 448 N.J. Super. at 365. Authentication may also be established by circumstantial evidence, Hannah, 448 N.J. Super. at 90, including, for example, by "'evidence establishing that it was sent in reply to a previous communication,'" ibid. (quoting State v. Mays, 321 N.J. Super. 619, 629 (App. Div. 1999)), or by evidence "'divulg[ing] intimate knowledge of information which one would expect only the person alleged to have been the writer or participant to have,'" ibid. (citation omitted).

Here, plaintiff first alleges that defendant did not make the requisite prima facie showing of authentication. We consider her argument in light of the guiding principles stated, which hold that the bar for authentication is relatively low. The record shows defendant provided direct testimony as to the existence of the Trust and its impact on her life from a financial perspective. Moreover, defendant's counsel also spent a significant amount of time eliciting testimony

13

from defendant regarding when and where she first came in contact with the

Trust and its addendum. For example, defendant gave the following testimony:

> [Defense Counsel]: Okay. When was that [T]rust handed to you?
>
> [Defendant]: It was handed to me—the [T]rust along with the addendum were handed to me together, and that was in 2017 when my loan officer said, you know, the underwrite—well, I'm sorry. It was—I won't—don't want to say what someone said. But, . . . it was expressed that $4,500 each month may not have been substantial enough. And I was asked, are you able to ask the grantor of your [T]rust to increase that amount to $5,500? And that's when an addendum was drafted.
>
> . . .
>
> [Defendant]: So then she drafted [an] addendum, and then that addendum was, as you saw, it was signed by [plaintiff] and
>
> [Defense counsel]: Okay. Did you see—and I'm now going to hand you, [defendant], this, a document that's been pre-marked D-2. Can you take a minute so I go over that?
>
> [Defendant]: Yes.
>
> [Defense Counsel]: Was this the document that [plaintiff], at that point, drafted?
>
> [Defendant]: Yes.
>
> [Defense Counsel]: Did you see [plaintiff] draft this document?

[Defendant]:  Yes, I did.

[Defense Counsel]:  Can you describe what you saw?

[Defendant]:  So she was—we were at [address] . . . she was in her room, at her computer, and she drafted this, she typed it.

. . .

[Defense Counsel]:  . . .  After this was drafted, was anything else done with the document?

[Defendant]:  . . . [Plaintiff] took the document to TD Bank in Marlton to have . . . a notary notarize it.

[Defense Counsel]:  Okay.  Did you go with her?

[Defendant]:  I was in the car with her. I went with her—

[Defense Counsel]:  Okay.  Did you—

[Defendant]:  —but I didn't go in the bank.

[Defense Counsel]:  Okay.  You didn't go in the bank.

[Defendant]:  No.

[Defense Counsel]:  When [plaintiff] came out of the bank—

[Defendant]:  Mm-hmm.

[Defense Counsel]:  —did she hand you that document?

[Defendant]:  She handed this to me, yes.

15

[Defense Counsel]: And when [plaintiff] handed you this document, did it appear as it appears now?

[Defendant]: Yes, it does.

[Defense Counsel]: Okay. Has this document been altered or manipulated in any way?

[Defendant]: Absolutely not.

Defendant was also able to recall specific conversations she had with plaintiff regarding the exhibits. We conclude the testimony and evidence supported the court's decision to admit the Trust documents into evidence. Plaintiff's argument is unavailing. In our view, the court did not abuse its discretion in admitting the Trust documents.

Plaintiff next argues that the "documents bear on their face numerous irregularities that make it impossible for [defendant] to make the requisite prima facie showing." However, we have stated "the ultimate question of authenticity of the evidence is left to the jury." State v. Brown, 463 N.J. Super. 33, 52 (App. Div. 2020) (quoting Mays, 321 N.J. Super. at 628). And, as plaintiff stated in her appellate brief, she was able to "repeatedly point[ ] out th[ese] discrepancies to the trial court." The jury was therefore well aware of any potential discrepancies contained in the documents, and as the ultimate fact finder, were able to weigh the evidence as they saw fit. See State v. Ingenito, 87 N.J. 204,

211 (1981) (explaining "[t]he jury's fact-finding function is all-inclusive and encompasses the evaluation of the credibility of witnesses and the weight and worth of evidence.").

Plaintiff also challenges the court's purported "failure to recognize the numerous indicia of unreliability" and the fact that "there was zero questioning of [defendant]" about the irregularities and inconsistencies in the exhibits. Again, we are unpersuaded. First, the record clearly established the court's awareness of the potential irregularities surrounding both exhibits. During the trial—outside the presence of the jury—the court allowed both exhibits to be moved into evidence but noted the addendum was "admittedly peculiar, given that you would not sign something before taking it to the notary." We are satisfied the court correctly found that issue was "really for the jury to assess, in terms of the weight to give that evidence if any."

Second, plaintiff's counsel had ample opportunity to cross-examine defendant about any potential irregularities in the Trust documents. Further, the court provided plaintiff's counsel the opportunity to call and question defendant as a hostile witness, however, counsel chose not to. Based on our review, we discern no reversible error or abuse of discretion in the court's admittance of the Trust documents into evidence.

17

B.

Next, plaintiff contends the jury's award of damages was improper and should be vacated, and a new trial on the issues of damages is warranted. In particular, plaintiff argues that the jury's award to defendant was "excessive," and the jury's award to plaintiff was "inappropriately low" because the jury only awarded $2,000 in damages for stolen property worth more than $200,000, which goes against the weight of the evidence. Defendant counters that the jury's damages awards were rational and should be affirmed.

We begin our analysis with the standard of review. "A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness[,]'" which "is not overcome unless [an appellant] can establish, 'clearly and convincingly,' that the award is 'a miscarriage of justice.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)). "[S]ubstantial deference . . . must be accorded [to] a damages award rendered by a jury." Graphnet, Inc. v. Retarus, Inc., 250 N.J. 24, 37 (2022) (alterations and omission in original) (quoting Orientale v. Jennings, 239 N.J. 569, 589 (2019)).

Because of the importance of the jury, the system requires "judicial restraint in exercising the power to reduce a jury's damages award." Cuevas,

226 N.J. at 485.  A jury award should stand unless it "is so patently excessive, so pervaded by a sense of wrongness, that it shocks the judicial conscience." Ibid.  The award must be so "disproportionate" that it would "constitute a miscarriage of justice" to allow it to stand.  Id. at 487.

Here, we are satisfied that the jury's award of damages was rational and not improper. The jury's award of $264,000 to defendant is not so patently excessive that it shocks the judicial conscience. At the trial, defendant testified that the last time she received a disbursement from the Trust was January 2019. The 2017 addendum to the Trust clearly established that defendant would receive $5,500 monthly from February 10, 2017, to February 10, 2023.  Based on that information, the jury was able to consider the months defendant did not receive a disbursement—February 2019 to February 2023—and multiplied that number by $5,500. The jury's logic was sufficiently reasonable, and comported with the evidence, thus making the $264,000 award not so "disproportionate" that it would "constitute a miscarriage of justice."

Second, as to plaintiff's jury award, we also conclude that $2,000 is not inappropriately low that it is clearly and convincingly constituted a miscarriage of justice. As the court correctly noted during the hearing for plaintiff's motion for a new trial, there were significant factual disputes regarding which personal

19

property was allegedly "stolen." Moreover, defendant testified numerous times that the "stolen" items she had in her possession were actually "gifts" from plaintiff or items she purchased herself. Thus, the only evidence plaintiff submitted at trial to support her claim that the "stolen" items totaled more than $200,000 was the Stolen Items List "that she compiled herself."

Plaintiff's "Stolen Items List" arbitrarily listed: (1) certain items she paid for; (2) what the replacement cost would be; and (3) items with an approximate purchase price. Further, the Stolen Items List contained one known example where an item was listed as "stolen," but was revealed during trial to be a gift from plaintiff to defendant. Based on the contested testimony, the trial court found the jury believed some of what each party said. Therefore, the court was satisfied the jury appropriately considered the information and arguments and arrived at a reasoned judgment on the issue of damages, which was not so disproportionate as to shock the conscience or to be manifestly unjust. Thus, we discern no abuse of discretion in the court's denial of plaintiff's motion for a new trial.

## C.

Finally, plaintiff contends that evidence concerning the FRO was irrelevant and prejudicial, warranting a new trial. Specifically, plaintiff argues

20

A-3034-22

that the court committed reversible error when it admitted the FRO into evidence and allowed defendant to give "lengthy" testimony concerning the physical altercation that gave rise to the FRO. Defendant contends that evidence concerning the FRO was not objected to and thus was not preserved for appeal.[4]

We apply an abuse of discretion standard to questions of whether the probative value of evidence is "substantially outweighed by its prejudicial nature" under N.J.R.E. 403. Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999). Under N.J.R.E. 403 "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of: (a) undue prejudice, confusion of issues, or misleading the jury; or (b) undue delay, waste of time, or needless presentation of cumulative evidence." The burden is on "[t]he party seeking the exclusion of the evidence [to] demonstrate that one or more of the factors listed in N.J.R.E. 403 substantially outweighs the probative value of the evidence." Griffin v. City of E. Orange, 225 N.J. 400, 420 (2016) (citations omitted).

---

[4] We disagree with defendant's assertion. Plaintiff's motion in limine was partially based on her desire to exclude the FRO from evidence, and plaintiff's counsel objected to defendant's testimony regarding the FRO. See Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018) (stating "[p]ursuant to Rule 1:7-2, in order to preserve an issue for appeal, a party . . . shall make known to the court specifically the action which the party desires the court to take or the party's objection to the action taken and the grounds therefor.").

In general, "[e]vidence claimed to be unduly prejudicial is excluded only when its 'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." Id. at 421 (alteration in original) (citations omitted). "[W]hen a party challenges the admission of evidence under N.J.R.E. 403, the question is not whether the challenged testimony will be prejudicial to the objecting party, 'but whether it will be unfairly so.'" Ibid. (emphasis added) (citations omitted). "[E]vidence that has overwhelming probative worth may [still] be admitted even if highly prejudicial." Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001) (quoting Green, 160 N.J. at 496).

The court did not abuse its discretion in admitting the FRO into evidence or in permitting defendant to testify about the underlying predicate act. First, defendant's testimony concerning the issuance of the FRO and the FRO itself both met the low threshold for relevance. See Verdicchio v. Ricca, 179 N.J. 1, 34 (2004) (stating "if evidence does support the existence of a specific fact, even obliquely, it is relevant and admissible."). Here, the evidence concerning the FRO was offered to explain plaintiff's potential intent or motive behind

terminating defendant's monthly disbursements from the Trust. This is clearly relevant to defendant's/third-party plaintiff's breach-of-contact claim.

Second, the evidence concerning the FRO was not unduly prejudicial as the court properly placed limitations on the testimony and the documents that could be admitted to ensure the prejudice would not outweigh the probative value. For example, on the first day of trial, defendant began to testify about an incident where plaintiff allegedly punched her in the face. The court immediately interjected and limited the testimony to only allow discussion of the domestic violence incident that resulted in the FRO because the court did not believe it to be "necessary or appropriate" to relitigate the parties' entire prior history of domestic violence.[5]

Moreover, when defendant's counsel sought to move the FRO into evidence, the court properly redacted the page that dealt with the dismissal of plaintiff's temporary restraining order on the grounds that it was not relevant to defendant's FRO. Additionally, in charging the jury, the court emphasized that "[t]he existence of [an FRO] is not an element of any claim of any party in this case." At bottom, the record clearly establishes that the court went to great

---

[5] On the record, plaintiff's counsel was asked if the limiting instruction was reasonable. He replied, "I think so."

lengths to ensure the evidence regarding the FRO was relevant, narrow, and not unduly prejudicial.

We conclude that the remaining arguments—to the extent we have not addressed them—lack sufficient merit to warrant any further discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3034-22