**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5135-15T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DONTE S. JONES,

      Defendant-Appellant.

_____

Submitted September 12, 2018 – Decided September 20, 2018

Before Judges Yannotti and Natali.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-04-1166.

Joseph E. Krakora, Public Defender, attorney for appellant (Brian P. Keenan, Assistant Deputy Public Defender, of counsel and on the brief).

Mary Eva Colalillo, Camden County Prosecutor, attorney for respondent (Jason Magid, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Donte S. Jones was charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); first-degree witness tampering, N.J.S.A. 2C:28-5(a); and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b). He was tried before a jury and found guilty on the witness-tampering count and not guilty on the remaining counts. The trial court sentenced defendant to twelve years of incarceration. Defendant appeals from the judgment of conviction dated June 15, 2016. We affirm.

I.

We briefly summarize the key facts, which we glean from the trial record. On May 31, 2012, Kishaun Burks was killed in Camden. Several months later, defendant was arrested, charged with Burks's murder, and incarcerated in the Camden County Correctional Facility (CCCF). On July 2, 2014, homicide detectives from the Camden County Prosecutor's Office (CCPO) learned that Jordan Walker, who had been incarcerated at the CCCF at the same time as defendant, wanted to provide a statement regarding Burks's murder. Walker informed the detective that defendant told him, "yeah, I killed him, but just

because I killed somebody doesn't make me a murderer." Defendant also told Walker he shot and killed Burks over a drug dispute.

On July 23, 2014, defendant called Walker's mother, D.B.[1] She knew that her son had provided the CCPO detectives with a statement about defendant, and that after he gave the statement, Walker had been moved to another correctional facility for his safety. D.B. said defendant had called her four times before she finally answered the phone. D.B. was frightened and felt she had to answer defendant's repeated calls.

On July 24, 2014, D.B. contacted Detective Lance Saunders of the CCPO, and Saunders interviewed her days later. Saunders obtained a copy of the CCCF's phone log, which confirmed defendant called D.B. on July 23, 2014. A recording of the call was played for the jury. During the call, defendant told D.B. that Walker had provided a statement to the police indicating defendant confessed to Burks's murder.

D.B. told defendant she had not been able to contact Walker and did not know where he was. Defendant gave D.B. the names of the detective and prosecutor in defendant's case so that D.B. could contact them to get information

---

[1] We use initials to identify certain persons involved in this matter to protect their privacy.

about her son.  Near the end of the conversation, the following exchange occurred:

> [D.B.]: So you've got to give me some time.  I got to figure this out.
>
> [Defendant]: Yes, ma'am.  Thank you.
>
> [D.B.]: Okay?
>
> [Defendant]: Thank you.  Thank you.  You know what I'm saying?
>
> [D.B.]:  You're welcome, Donte.
>
> [Defendant]: That's why I never came like -- like oh this and that, or posing threats or anything.  Nah, because this is like -- I think [Walker] is a good person.  He will come to his senses with this.  You know?  You know what I'm saying?
>
> [D.B.]: Right.
>
> [Defendant]:  And --
>
> [D.B.]: Right.
>
> [Defendant]:  -- he has his -- I know -- I understand he has his own issues, I understand he's not built for this.  You know what I'm saying?  He told me like, man, he's [g]oing to do whatever, he's going to cooperate against people in his case or whatever and I was like, all right, you got to do what you've got to do, they told on you, whatever.  You know what I'm saying?  And you're supposed to take the rap, you got to do . . . what you got to do.  But for him to not know what's going on with my situation and go off for hearsay, like that's really,

really not cool. You know what I'm saying? I'm hoping he can come to his senses or that you talk to him -- or you talk to him or whatever because it's like -- suppose I was a bad guy or a guy that could reach out -- my arms could reach out to the streets and they just give me -- give me all this family's like --

[D.B.]: Right.

[Defendant]: -- addresses and stuff like that. You know what I'm saying?

[D.B.]: Right.

[Defendant]: They give me all ya'll, information, his social security, everything. You know what I'm saying? He don't know that t[h]ough, you know, because he never been through this, he don't know that. But this is the type of thing -- that's the type of game they play, they don't care about you, they don't care about people's safety or life or situations --

[D.B.]: Okay.

[Defendant]: -- like that.

. . . .

[Defendant]: He's a real good person. That's -- other people --- he was -- because he's like some other guys, like hit men and all of these other people that's putting stuff in his head. You know? He don't know nothing about this kind of stuff. You know what I'm saying?

[D.B.]: No, he's not about that life.

[Defendant]: He's not.

A-5135-15T1

[D.B.]: He's nothing.

[Defendant]: He's not.

[D.B.]: -- he's not. He's just a regular old kid.

[Defendant]: He is. He is. He shouldn't really be in here. Because of his story he shouldn't be in here. You know what I'm saying? And I see you guys coming up to the window and -- like he really shouldn't be in there. You know what I mean? You can't (inaudible) no cause for this. You know what I'm saying? And then for them to use him like that is not right. You know what I'm saying?

[D.B.]: That's what (inaudible). Now I'm starting to think that somebody used him. Did somebody. -- You know what I'm saying?

[Defendant]: Yeah.

[D.B.]: Like this doesn't make any sense. [Walker] is not -- he's not a snake, he's not a rat, he's never been -- he's never been this type of person. He's never -- you know, I've been, and his stepdad, we've been amazed at how he's pulling through in there.

[Defendant]: Yeah.

The conversation concluded with the following exchange:

[D.B.]: I know.

[Defendant]: I know --

[D.B.]: I know.

[Defendant]: -- every -- he knows everything about my family, I know everything about him. You know what I'm saying?

[D.B.]: Right.

[Defendant]: I know his stepdad is from Philly, or whatever, and his dad got locked -- he said his dad got locked up. I know everything about the kid. You know what I'm saying? We were --

[D.B.]: Yes.

[Defendant]: -- really close.

[D.B.]: Yeah. I don't know. You've got to give me some time. I --

[Defendant]: Okay. Okay. Okay, Miss [D.]

[D.B.]: All right, honey.

[Defendant]: Thank you.

[D.B.]: You're welcome.

D.B. testified that she felt scared and uneasy during the call. Based upon her conversation with defendant, D.B. believed she could be located. D.B. said she received a second call from a person who identified herself as defendant's mother. D.B. described that call as a mother-to-mother conversation and said it "wasn't a bad call." D.B. had no further contact with defendant or the person claiming to be his mother.

Walker testified that on October 24, 2014, after he agreed to testify against defendant, he met defendant when he was in a holding cell at the Camden County courthouse. Walker said this meeting was a "set up." He stated that he should not have been in a cell with defendant because an order had been issued requiring that they be kept separate. He also stated that one of defendant's hands was not in handcuffs.

Walker testified that when he entered the holding cell, defendant immediately inquired why he had snitched. According to Walker, defendant said, "what's up" and he asked him "why did you do it?" Walker responded and defendant said, "you know, you can always take it back." Defendant informed Walker of the repercussions of being a snitch. Walker testified that "[defendant] said, well you know that people like you, you know, when they go down state they don't live down state. You know, they're going to find out you snitched. And when they find out you snitched you can't live anywhere but PC."[2]

Walker added that defendant told him of someone he knew who snitched like Walker and was also incarcerated. Defendant said that person was not "living" because he was getting beat up. Walker interpreted this as an attempt by defendant to scare him from testifying against him at trial. According to

---

[2] "PC" apparently means protective custody.

Walker, defendant also said he had his personal information, including his address. Defendant told Walker to write him a letter if he decided not to testify and that if he did not receive a letter, he would know he was going to snitch.

On March 4, 2015, Saunders spoke with Walker. Thereafter, Saunders obtained the surveillance that showed Walker and defendant together in a holding cell. The video, which did not have a sound recording, was shown to the jury.

On March 18, 2015, Saunders received a letter that defendant purportedly wrote to Walker's co-defendant, Zahir Camillo. Saunders interviewed Camillo and found the letter in Camillo's cell. The letter stated the following:

> You probably don't know me, but I was in the room with your co[-]defendant, Walk[er]. I copied down your information to let you know he owns some bullshit. He really got plans on taking the stand on you and the other bull. To make matters worse, he jumped in my case and I got a homicide. I'm facing life. He was my bunky and smiled in my face then bit me in the ass. But he shit him out because he made a statement that's all lies. I got a baby mom and an eight year old son and he knew that shit. I need you to help me out, please. I need some numbers and addresses to see if I can defuse the situation. Send me that [n* * * ] street info, please, bro. Send me his girl's info, or numbers too. I really need you cuz my life on the line and this [n* * * ] don't care about nothing or nobody. He even told me ya'll want him to take back his statement, but he's not taking shit back and don't care if you all get smoked. You and Keys. Write me back and please help

me out, bro. It might work in all our favors, trust me. Ala will deal with him, trust me. People that pull these types of selfish stunts don't last long.

As stated previously, defendant was found not guilty of murder and the weapons charges, but guilty of first-degree witness tampering. At sentencing, the judge decided that because the verdict sheet did not include an element of the tampering charge, which elevated that charge to a first-degree offense, defendant had to be sentenced as a second-degree offender. The judge granted the State's motion for imposition of an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a), and imposed a twelve-year term of incarceration. The judge also imposed appropriate fees and penalties.

Defendant appeals and raises the following arguments:

POINT I
THE TRIAL JUDGE ERRED IN ADMITTING A HEARSAY LETTER PURPORTEDLY WRITTEN BY [DEFENDANT] WITHOUT AUTHENTICATION CONTRARY TO THE RULES OF EVIDENCE.

POINT II
PROSECUTORIAL MISCONDUCT DURING SUMMATION DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL RESULTING IN HIS CONVICTION ON THE TAMPERING CHARGE.

POINT III
THE TRIAL JUDGE ERRED IN FINDING AN [AGGRAVATING] FACTOR AND IN FAILING TO FIND MITIGATING FACTORS SUPPORTED BY

THE RECORD, RESULTING IN A MANIFESTLY
EXCESSIVE SENTENCE.

## II.

Defendant argues that the assistant prosecutor "persuaded" defense counsel to agree to the admission of the letter that defendant allegedly wrote to Camillo. Defendant further argues that the trial judge erred by instructing the jury regarding its role in determining whether he wrote the letter and what effect, if any, the letter would have on its deliberations.

We note that initially defendant's attorney objected to the admission of the letter into evidence on the ground that it had not been properly authenticated. However, defendant's attorney withdrew the objection and told the judge the letter and the envelope in which it was contained could be admitted because Saunders had seized this evidence from Camillo's cell. Defendant's attorney stated, however, that he would object to Saunders identifying the person who wrote the letter. On appeal, defendant argues that his attorney raised a proper objection on authentication of the letter, and the judge should have ruled on the objection.

Because defense counsel withdrew the initial objection on the basis of a lack of authentication, we must review the claimed error under the plain error standard. See R. 2:10-2. Under that standard, an appellate court will not reverse

a jury's verdict unless the error was "of such a nature as to have been clearly capable of producing an unjust result." Ibid. The error must have been "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached[.]" State v. McGuire, 419 N.J. Super. 88, 106-07 (App. Div. 2011) (alteration in original) (quoting State v. Taffaro, 195 N.J. 442, 454 (2008)). Applying that standard, we conclude the judge did not err by admitting the letter into evidence.

"[A] writing must be properly authenticated before it is admitted into evidence." State v. Marroccelli, 448 N.J. Super. 349, 364 (App. Div. 2017) (citing State v. Hannah, 448 N.J. Super. 78, 89 (App. Div. 2016)). "However, the burden of establishing a prima facie showing of authenticity 'was not designed to be onerous.'" Ibid. (quoting Hannah, 448 N.J. Super. at 89).

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims." State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999) (citing N.J.R.E. 901). The rule "does not require absolute certainty or conclusive proof. The proponent of the evidence is only required to make a prima facie showing of authenticity." Ibid. (citing In re Blau, 4 N.J. Super. 343, 351 (App. Div. 1949); McCormick on Evidence § 222 (John

William Strong ed., 4th ed. 1992)). Once a prima facie showing has been made, the court should admit the evidence, and the ultimate question of authenticity is then decided by the jury. Ibid.

Moreover, it is well-established that a document may be authenticated by circumstantial evidence. N.J. Div. of Youth & Family Servs. v. J.T., 354 N.J. Super. 407, 413 (App. Div. 2002) (citing State v. Porambo, 226 N.J. Super. 416, 426-28 (App. Div. 1988); State v. Bassano, 67 N.J. Super. 526, 532-34 (App. Div. 1961)).

> A writing or telephone conversation may be authenticated indirectly, regardless of its age, on testimony that one has received a letter signed with a person's name or has had a telephone conversation with one identifying himself as a particular person, and that the writer of the letter or other participant in the conversation divulged intimate knowledge of information which one would expect only the person alleged to have been the writer or participant to have.
>
> [Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 3(b) on N.J.R.E. 901 (2018).]

Therefore, "sufficient circumstantial indicia of reliability" may establish a prima facie showing of authentication. Mays, 321 N.J. Super. at 629.

Defendant argues that in this case the State failed to make a prima facie showing of authenticity for admission of the letter into evidence. Defendant notes that there is no signature on the letter; the person who received the letter

did not know defendant; no one testified he saw defendant write the letter; and the State did not present testimony from an expert witness, or person familiar with defendant's handwriting, opining that defendant wrote the letter.

We are convinced, however, that the State presented sufficient evidence to authenticate the letter and envelope. The letter was in an envelope that was addressed to Camillo and indicated it had been sent by defendant, with a return address. The envelope also was addressed to the CCCF and stated "in-house mail," which indicated that the author and Camillo were both housed in that facility.

Furthermore, in the letter, the author states that he shared a cell with Walker, acknowledges that Camillo is Walker's co-defendant, and mentions details of both defendant's and Camillo's cases. In addition, the author states he has an eight-year-old son, which was the age of defendant's son at the time. The author concludes by asking Camillo for personal information about Walker, including street addresses and phone numbers.

We note that, during a pre-trial proceeding, in arguing that the State lacked probable cause for the witness-tampering charge, defendant's attorney acknowledged that defendant wrote the letter. Defendant's attorney stated, "[m]y client made the mistake of writing the letter himself. He [should not]

14

have done that. He should have come to me and asked me to do the investigation."

In addition, as we pointed out previously, at trial, defendant's attorney did not object to the admission of the letter and envelope into evidence. Indeed, an objection at trial would have been inconsistent with counsel's assertion during the pre-trial proceeding that defendant had, in fact, written the letter.

We therefore conclude the judge did not err by admitting the letter and the envelope into evidence. Furthermore, defendant has not shown that the admission of this evidence was "clearly capable of producing an unjust result." R. 2:10-2.

## III.

Next, defendant argues the assistant prosecutor made improper comments during summation. Defendant contends the prosecutor engaged in "egregious misconduct" that deprived him of his right to a fair trial. We disagree.

Our courts have long recognized that "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence." State v. Cole, 229 N.J. 430, 457 (2017) (alteration in original) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). A prosecutor may comment on the evidence and the reasonable

inferences that could be drawn therefrom. Frost, 158 N.J. at 85 (citing State v. Marks, 201 N.J. Super. 514, 534 (App. Div. 1985)).

Nevertheless, "prosecutors should be mindful of the purpose for which evidence is admitted when they comment on that evidence in summation." Cole, 229 N.J. at 457. A prosecutor's reference "to matters extraneous to the evidence" may provide grounds for a finding of prosecutorial misconduct and reversal. State v. Jackson, 211 N.J. 394, 408 (2012) (citing State v. Rose, 112 N.J. 454, 521 (1988)). However, "'not every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal" of a conviction. Id. at 408–09 (quoting State v. Williams, 113 N.J. 393, 452 (1988)).

"A defendant's allegation of prosecutorial misconduct requires the court to assess whether the defendant was deprived of the right to a fair trial." State v. Pressley, 232 N.J. 587, 593 (2018) (citing Jackson, 211 N.J. at 407). "To warrant reversal on appeal, the prosecutor's misconduct must be 'clearly and unmistakably improper' and 'so egregious' that it deprived defendant of the 'right to have a jury fairly evaluate the merits of his defense.'" Id. at 593–94 (quoting State v. Wakefield, 190 N.J. 397, 437-38 (2007)). Reversal is warranted only if the prosecutor's conduct "substantially prejudiced . . . defendant['s] fundamental right[s]." State v. Johnson, 31 N.J. 489, 510 (1960).

In determining whether a prosecutor's comments were sufficiently egregious to warrant reversal, the reviewing court must consider "the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred." Jackson, 211 N.J. at 409 (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)). The court must consider: "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Ibid. (quoting State v. Smith, 167 N.J. 158, 182 (2001)).

Appellate courts, however, are "bound[] by the proofs and objections critically explored on the record before the trial court by the parties themselves." State v. Robinson, 200 N.J. 1, 19 (2009). Thus, absent an objection, the defendant on appeal must establish that the prosecutor's conduct constitutes plain error. State v. Feal, 194 N.J. 293, 312 (2008). Reversal of a conviction is warranted only if the error was "clearly capable of producing an unjust result." R. 2:10-2.

On appeal, defendant argues that the assistant prosecutor improperly commented that he wrote the letter that Saunders found in Camillo's cell. The prosecutor stated:

[Y]ou also have the letter written to [Walker's] co[-]defendant, the letter that was written shortly after [Walker] gives information to police. In the letter the defendant gives some background information on himself and then goes on to write, "I need some numbers and address, the address to see if I can diffuse these situations. Send me that [n * * *] street info please, bro. Send me his girl's info or number two [sic]."

Then he goes on to end the letter with "It might work in all, all our favor. Trust me. I will deal with him, trust me. People that pull these type of selfish stunts don't last long."

. . . .

So there you have it. The defendant actually tells [Walker] exactly how he intends on having him work in not only the defendant's favor, but also in [Walker's] co[-]defendant's favor. He not only wrote it in that letter, but also tells [Walker] in person. And that being that this snitch won't last long.

. . . .

So what does the defendant do when he finds out that [Walker] snitched on him? He calls [Walker's] mom. He even calls – has his mom call [Walker's] mom. [H]e writes a letter to Zahir asking for [Walker's] street information, and threatens [Walker] in that holding cell.

Although the trial judge prohibited Saunders from testifying that defendant wrote the letter to Camillo, the judge's ruling did not preclude the assistant prosecutor from arguing during summation that defendant was the

author of the letter. As we have explained, the State did not present any direct evidence that defendant wrote the letter, but there was sufficient circumstantial evidence from which the jury could infer that defendant was its author. Therefore, the assistant prosecutor's comments were fair comment on the evidence.

Defendant further argues the assistant prosecutor improperly discussed his encounter with Walker in a holding cell at the courthouse. The prosecutor stated:

> Well, ladies and gentlemen, that takes me to the video you saw, the video from October 20, [2014] when the defendant, despite being forbidden, despite him being forbidden, inexplicably ends up in the same holding cell as [Walker] for approximately an hour and [forty-five] minutes.
>
> And when, and when [Walker] initially walks into that cell he sees that a defendant has one hand loose, which is odd because both hands should be cuffed. And as you saw from the video, [Walker] merely begins to shake his head as he sits down.
>
> Now [at] this point any reasonable person would think this is a set-up, where this defendant has some sort of pull or inside connection or a way of getting to him if he wants to.

Defendant contends the prosecutor had "no basis whatsoever" to imply that he set up the encounter. Defendant asserts he was under the control of the

corrections officers, and he had no choice but to be in that cell.  He contends the corrections officers were responsible for ensuring that he and Walker were not in the same cell together.  He therefore argues that the prosecutor's comments were "highly inflammatory and implied wrongdoing" on his part.

We conclude, however, that Walker's testimony provided sufficient evidential support for the prosecutor's statements.  Walker testified that he believed his encounter with defendant was a "set up" because he was not supposed to be in a cell with defendant.  Walker also testified that one of defendant's hands was not in cuffs, and defendant immediately accused him of snitching when they met.  Thus, the prosecutor's remarks were fair comment on the evidence.  The remarks were not improper, nor were they "clearly capable of producing an unjust result."  R. 2:10-2.

Furthermore, defense counsel did not object to the prosecutor's comments when they were made. Where, as here, defense counsel makes no objection to a prosecutor's comments, generally the remarks will not be considered prejudicial. State v. Echols, 199 N.J. 344, 360 (2009) (citing Timmendequas, 161 N.J. at 576).  We therefore reject defendant's contention that the assistant prosecutor's remarks denied him of his right to a fair trial.

IV.

Defendant also argues that his sentence is manifestly excessive. He contends the trial judge erred in her findings of the aggravating and mitigating factors.

As we noted previously, the judge sentenced defendant as a second-degree offender. The judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (extent of defendant's prior criminal record and the seriousness of the offenses); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge found no mitigating factors.

The judge also found that defendant was eligible for an extended term pursuant to N.J.S.A. 2C:44-3(a). The statute provides that an extended term may be imposed upon a persistent offender who has been convicted of a crime of the first, second, or third-degree. Ibid. The statute further provides that

> [a] persistent offender is a person who at the time of the commission of the crime is [twenty-one] years or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least [eighteen] years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced.

[Ibid.]

On appeal, defendant does not dispute that he qualified for imposition of a discretionary extended term under N.J.S.A. 2C:44-3(a), and he does not argue that the judge erred by finding aggravating factors three and nine. Rather, defendant maintains the judge erred by finding aggravating factor six. He also argues that the judge erred because she did not find certain mitigating factors.

"An appellate court's review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). In reviewing a sentence, the court must determine whether: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were . . . 'based upon competent credible evidence in the record;' [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (third alteration in original) (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)). "An appellate court is bound to affirm a sentence, even if it would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. O'Donnell, 117 N.J. 210, 215 (1989) (citing State v. Jarbath, 114 N.J. 394, 400-01 (1989); Roth, 95 N.J. at 364-65).

As noted, defendant argues that there is insufficient evidence in the record to support the judge's finding of aggravating factor six. Defendant asserts the trial judge correctly found he had two prior criminal convictions, which made him eligible for an extended term, and that those convictions could not be used as a factual basis for finding aggravating factor six. He argues that the remainder of his criminal record does not support the finding of this aggravating factor.

We conclude, however, that there is sufficient credible evidence in the record to support the judge's finding of aggravating factor six. The record shows that defendant has a lengthy juvenile criminal history. As a juvenile, defendant was adjudicated delinquent nine times. He received sentences that included probation, residential programs, and incarceration. The record also shows that as an adult, defendant has a conviction in addition to the two convictions that made him eligible for the extended term. The record thus supports the judge's finding of aggravating factor six.

Defendant also contends the judge erred by failing to find mitigating factor one. N.J.S.A. 2C:44-1(b)(1) (defendant's conduct did not cause or threaten serious harm). There is sufficient credible evidence in the record to support the judge's determination that this mitigating factor did not apply. Defendant had threatened Walker, who provided a statement to law enforcement

and was prepared to testify that defendant admitted killing Burks. The record supports the judge's finding that defendant had threatened to inflict serious harm upon the witness.

Next, defendant argues that the judge erred by failing to find mitigating factor two. N.J.S.A. 2C:44-1(b)(2) (defendant did not contemplate that his conduct would cause or threaten serious harm). As noted, the evidence established that defendant attempted to influence the outcome of the case by threatening a witness. The judge properly determined that defendant contemplated his conduct would threaten serious harm. Thus, this mitigating factor did not apply.

In addition, defendant contends the judge should have found mitigating factor eight. N.J.S.A. 2C:44-1(b)(8) (defendant's conduct was the result of circumstances unlikely to recur). The judge noted that defendant has an extensive criminal history, and the evidence presented at trial established he had engaged in witness tampering. The record thus supports the judge's determination that defendant's witness tampering was the result of conduct that was likely to recur.

Defendant further argues that the judge erred by failing to find mitigating factor eleven. N.J.S.A. 2C:44-1(b)(11) (defendant's incarceration will entail

excessive hardship to defendant or his dependents). The judge noted that defendant had not submitted any evidence to show that his incarceration would entail excessive hardship to himself or a dependent. Thus, the judge correctly found this mitigating factor did not apply.

In sum, there is sufficient evidence in the record to support the judge's findings of aggravating factor three, six, and nine, and the judge's determination that no mitigating factors applied. The twelve-year sentence does not shock the judicial conscience, and does not represent an abuse of the trial court's sentencing discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION